UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
MAJOR ENERGY ELECTRIC SERVICES, LLC,
MAJOR ENERGY SERVICES, LLC, RESPOND
POWER, LLC, NATIONAL GAS & ELECTRIC,
LLC, and SPARK HOLDCO, LLC,

                Plaintiffs,

        - against -

SAUL HOROWITZ, individually and as
Sellers' Representative, MARK
WIEDERMAN, ASHER FRIED, MICHAEL
BAUMAN, and MARK JOSEFOVIC,

               Defendants.
------------------------------------X

**MEMORANDUM AND ORDER**

19 Civ. 10431 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Saul Horowitz, Mark Wiederman, Asher Fried, Michael Bauman, and Mark Josefovic (collectively, "Sellers") move to dismiss the complaint of Major Energy Electric Services, LLC ("MEES"), Major Energy Services, LLC ("MES"), Respond Power, LLC ("RP"), National Gas & Electric, LLC ("NGE"), and Spark Holdco, LLC ("Spark," and, collectively with MEES, MES, RP, and NGE, the "Indemnified Parties"). Sellers' motion is granted in part and denied in part for the reasons stated herein.

### I. BACKGROUND

MEES, MES, and RP, which the parties refer to collectively as "Major Energy," sell electricity and natural gas to residential and commercial customers throughout the United States. Sellers

previously owned the membership interests in Major Energy, with
Wiederman and Horowitz having served as Major Energy's President
and Senior Advisor, respectively, since before 2012.  Compl. ¶ 12.
On March 18, 2016, Sellers sold their membership interests in Major
Energy to NGE for $80 million pursuant to a Membership Interest
Purchase Agreement, which sale closed on April 15, 2016.  See
Compl., Ex. A ("MIPA").  After NGE purchased Major Energy, it
resold it to its affiliate Spark.  Spark and NGE are under the
common control of W. Keith Maxwell III, and Spark is the sole
member of each of the three limited liability companies that
comprise Major Energy.  The Indemnified Parties are thus under the
common control of W. Keith Maxwell III.  Sellers Wiederman and
Horowitz continued to serve as Major Energy's President and Senior
Advisor, respectively, following its sale.  See Compl. ¶ 12.

In the MIPA, Sellers made certain representations and
warranties about Major Energy to NGE.  This litigation concerns
whether Sellers breached those representations and warranties --
i.e., whether those representations were untrue when the parties
executed the MIPA or when the sale closed -- and, if so, whether
the MIPA obligates Sellers to indemnify the Indemnified Parties
for the resulting losses.

-2-

## 1. The Membership Interest Purchase Agreement

In Article 4 of the MIPA, Sellers made certain representations and warranties about Major Energy to NGE.  Pertinent to the instant dispute are three such representations and warranties.

First, Sellers represented in Section 4.4 that:

Except as set forth in Schedule 4.4:

(a) Each Company has filed (taking into account any valid extensions) all Tax Returns required to be filed by it in all jurisdictions in which such returns are required to be filed.  Such Tax Returns are true, complete and correct in all material respects and, accordingly, accurately and correctly reflect the Taxes of such Company for the periods covered thereby.  No Company is currently the beneficiary of any extension of time within which to file any Tax Return.  All Taxes due and owing by each Company which are attributable to the Pre-Closing Tax Periods either (i) shall have been paid as of the Closing Date, whether or not such Taxes are shown to be payable on such Company's Tax Returns or on subsequent assessments thereto, or (ii) are or shall be accrued on the Financial Statements.  The term "Pre-Closing Tax Period" means all taxable periods or portions thereof ending on or prior to the Closing Date.

MIPA § 4.4.  Sellers disclosed in Schedule 4.4 that:

The following Tax Returns are not expected to be filed by Closing and an extension has been requested in each case as of the Closing Date:

1. 2015 Form 1065 and all related state and local returns for MES, MEES and RP

2. Any 2016 interim Tax Returns for such entities

[MEES] received a notice from the New York City Department of Finance dated February 24, 2016, advising MEES that the NYC Dept. of Finance wishes to examine the

> book and records of MEES for the tax periods 07/01/13
> through 12/31/15, and requesting certain information
> from MEES as set forth in such notice.   This audit is
> currently ongoing.

Declaration of Israel Dahan ("Dahan Decl."), Ex. 1.

> Second, Sellers represented in Section 4.7 that:

> Except as set forth in Schedule 4.7, (a) there is no
> pending or, to the Knowledge of the Sellers, threatened
> Legal Proceeding to which any Company is a party (either
> as plaintiff or defendant), to which its assets are
> subject, or to which any Seller or any Affiliate of any
> Seller is a party, relating to the Companies, including
> any claims, demands, disputes, lawsuits, judicial,
> regulatory, or other Legal Proceedings, Orders, or other
> breaches of Legal Requirements or similar matters;
> . . . (d) no event has occurred or circumstances exist
> that may give rise to, or serve as a basis for, any such
> Legal Proceeding; . . . .

MIPA § 4.7.   The MIPA defined the phrase "Legal Proceeding" to

include "any judicial . . . actions, suits or proceedings (public

or private) by or before a Governmental Body," and defined the

phrase "Governmental Body" to include "any . . . court or tribunal

in any jurisdiction."   MIPA § 1.1.

Third, Sellers represented in Section 4.8(a) that "[e]ach

Company [was] in compliance in all material respects with all Laws

applicable to it or its business, properties or assets."   MIPA §

4.8(a).   Section 8.1(a) required that the representations in

Sections 4.4, 4.7, and 4.8 be true also when the sale closed.   See

MIPA § 8.1.

-4-

Article 9 of the MIPA included certain indemnification provisions. Under Section 9.2(a), Sellers agreed that if they breached any representation in Article 4 -- i.e., if any of those representations were untrue when the parties executed the MIPA or when the sale closed -- they would indemnify the Indemnified Parties for the resulting losses. Specifically, Section 9.2(a) states that:

> Each Seller . . . shall indemnify and hold harmless [NGE] and its directors, officers, employees, Affiliates, owners, agents, attorneys, representatives, successors and permitted assigns (collectively, the "Buyer Indemnified Parties"), from and after the date of this Agreement, against and in respect of all claims, demands, Legal Proceedings, Liens, judgments, penalties, damages, losses, costs, and expenses (including reasonable attorneys' fees in connection therewith or in pursuing right to indemnification hereunder) (collectively, "Losses") that the Buyer Indemnified Parties incur to the extent caused by . . . the breach of any representation or warranty of the Sellers contained in Article 4 of this Agreement . . . ."

MIPA § 9.2(a). Because the MIPA defines an "Affiliate" of an LLC to include any LLC that is "under common control with" it, MIPA § 1.1, Section 9.2(a)'s defined term "Buyer Indemnified Parties" includes, in addition to NGE, Spark, MEES, MES, and RP, because each of those entities is under common control with NGE. Section 9.2(a)'s defined term "Buyer Indemnified Parties" accordingly includes the Indemnified Parties.

-5-

Section 9.2(a) was subject to Section 9.4(a), which stated that:

> [T]he Sellers shall have no liability pursuant to Section 9.2(a) . . . until the Losses incurred by the Buyer Indemnified Parties shall exceed Six Hundred Thousand Dollars ($600,000.00) ("Losses Threshold"), in which event the Sellers shall be liable to the Buyer Indemnified Parties solely for all Losses in excess of such amount."

MIPA § 9.4(a).  Section 9.4(a)'s losses threshold, however, did not apply to "any breach of the Fundamental Representations," MIPA § 9.4(c), which the MIPA defined to include Section 4.7 but not Sections 4.4 and 4.8, MIPA § 9.1.

### 2. MEES's Allegedly Fraudulent Marketing

On March 9, 2018, the Attorney General of the State of Illinois filed a lawsuit against MEES alleging that it had fraudulently marketed its services to Illinois residents since at least 2012.  See Compl., Ex. B ¶¶ 1-6.  The Illinois Attorney General's complaint was replete with concrete examples, including excerpts of recorded telephone calls, of MEES sales representatives systematically employing a range of fraudulent tactics to deceive Illinois residents into switching to MEES's more expensive utility services.  See Compl., Ex. B ¶¶ 115-129.

On May 30, 2018, while the Illinois Attorney General's lawsuit was ongoing, the Indemnified Parties requested that Sellers

-6-

indemnify them for the attorneys' fees and costs they were incurring.  Compl. ¶ 28.  Sellers refused to do so.  Compl. ¶ 29. On October 10, 2018, the Illinois court presiding over the litigation denied MEES's motion to dismiss the case, see People v. Major Energy Elec. Servs., LLC, 2018 WL 8544536 (Ill. Cir. Ct. Oct. 10, 2018), after which Wiederman and Horowitz "deci[ded] to cease MEES marketing in Illinois and evaluate pretrial resolution options" with the Illinois Attorney General, Compl. ¶ 32.

During July 2019, the Indemnified Parties allegedly "informed [Sellers] of the progress toward settlement and the monetary amount being contemplated for the settlement," in response to which Sellers allegedly "advised that they did not intend to object or stand in the way of [the Indemnified Parties'] effort to finalize [a] settlement with the State of Illinois."  Compl. ¶¶ 38-39.  The Indemnified Parties then allegedly informed Sellers that they had reached a settlement with the Illinois Attorney General and provided Sellers a copy of the draft settlement agreement, reminding Sellers of their indemnification obligations under the MIPA.  Compl. ¶ 40.

The Illinois Attorney General and MEES settled the litigation in the summer of 2019, and, on August 16, 2019, the Illinois court entered a Final Judgment and Consent Decree requiring MEES to pay

a $2 million civil monetary penalty and permanently enjoining it from a range of conduct in Illinois.  See Compl., Ex. C (the "Consent Decree").  The Consent Decree stated that MEES denied the Illinois Attorney General's allegations, and that "[n]othing contained in this Consent Decree is intended by the parties to be deemed or construed as an admission of liability by [MEES].  The parties are entering into this Consent Decree solely for the purpose of avoiding costly and protracted litigation."  Consent Decree ¶¶ 6-7.  As of the date of the Consent Decree, the Indemnified Parties had allegedly incurred $866,270.20 of attorneys' fees and costs, and they requested that Sellers indemnify them for $2,866,270.20, i.e., the total penalties, attorneys' fees, and costs incurred as a result of the litigation. Compl. ¶ 42.  Sellers refused to do so.  Compl. ¶¶ 42-43.

The Indemnified Parties allege in the present action that MEES, under the leadership of Sellers, in fact fraudulently marketed its services as alleged in the Illinois Attorney General's complaint, see Compl. ¶¶ 31, 46, 49, 50-51, and that "the evidence adduced" in the litigation "demonstrates" that it did, Compl. ¶ 50.

### 3. The State Tax Deficiencies

Since Sellers sold Major Energy to NGE, New York, Massachusetts, and New Jersey have required the Indemnified Parties to pay tax obligations that Major Energy failed to pay while Sellers owned it.

First, following an audit of MES, the New York State Department of Taxation and Finance determined that MES had unpaid taxes for the 11 consecutive three-month filing periods the first and last of which ended on May 31, 2014 and November 30, 2016, respectively.  See Compl., Ex. E at 5.  Second, following an audit of MEES, the Massachusetts Department of Revenue determined that MEES had unpaid taxes for the 26 one-month filing periods that ended on July 31, 2014, August 31, 2014, October 31, 2014, November 30, 2014, December 31, 2014, January 31, 2015, February 28, 2015, March 31, 2015, April 30, 2015, May 31, 2015, June 30, 2015, July 31,2015, August 31, 2015, September 30, 2015, October 31, 2015, November 30, 2015, December 31, 2015, January 31, 2016, February 29, 2016, March 31, 2016, April 30, 2016, May 31, 2016, June 30, 2016, and July 31, 2016, respectively.  See Compl., Ex. E at 11. Third, the Division of Taxation of the Department of the Treasury of the State of New Jersey determined that RP had unpaid taxes for filing periods in 2015.  See Compl., Ex. D at 12-13.

The Indemnified Parties paid $436,271.34 in taxes, interest, and penalties in satisfaction of Major Energy's unpaid taxes. Compl. ¶ 44.  On October 15, 2019, the Indemnified Parties requested that Sellers indemnify them for the amount of those payments, which Sellers refused to do.  Compl. ¶ 44.; Compl., Ex. D at 3-4.

### 4. Procedural History

On November 8, 2019, the Indemnified Parties sued Sellers for breach of Section 9.2(a) of the MIPA.  The Indemnified Parties maintain that Sellers breached Sections 4.7 and 4.8 because MEES had fraudulently marketed its services to Illinois residents since at least 2012, and that Sellers breached Sections 4.4, 4.7, and 4.8 because Major Energy had unpaid taxes for tax periods predating the close of sale.  The Indemnified Parties contend that Section 9.2(a) accordingly required Sellers to indemnify them for the resulting losses -- the $2,866,270.20 spent in defending and settling the Illinois Attorney General's lawsuit and the $436,271.34 paid in satisfaction of Major Energy's unpaid taxes in New York, Massachusetts, and New Jersey -- and that Sellers breached Section 9.2(a) by refusing to do so.

## II. DISCUSSION

### 1. Standard of Review and Legal Principles

Sellers move to dismiss the complaint "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).   Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000).   "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A., 773 F.3d 110, 114 (2d Cir. 2014) (quotation marks omitted).   "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of the entire integrated agreement," Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002) (quotation marks omitted), and "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts," W.W.W. Assoc., Inc. v. Giancontieri, 566 N.E.2d 639, 641 (N.Y. 1990). Where "the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." Rainbow v. Swisher, 527 N.E.2d 258, 259 (N.Y. 1988).

The Court addresses the alleged breaches of the representations and warranties in Sections 4.4, 4.7, and 4.8 of the MIPA seriatim.

### 2. MEES's Allegedly Fraudulent Marketing

Sellers contend that the Indemnified Parties have failed to allege that they breached Sections 4.7 and 4.8 based on MEES's allegedly fraudulent marketing in Illinois, even though the Indemnified Parties paid a $2 million civil penalty to settle the Illinois Attorney General's lawsuit.

#### a. Section 4.7

Sellers represented in Section 4.7(a) that, when the parties executed the MIPA and when the sale closed, "there [was] no pending or, to the Knowledge of the Sellers, threatened Legal Proceeding

-12-

to which [Major Energy] [was] a party (either as plaintiff or defendant), to which its assets are subject, or to which any Seller or any Affiliate of any Seller is a party, relating to [Major Energy], including any claims, demands, disputes, lawsuits, judicial, regulatory, or other Legal Proceedings, Orders, or other breaches of Legal Requirements or similar matters." MIPA § 4.7(a). The parties agree that Sellers did not breach Section 4.7(a) because the Illinois Attorney General filed its lawsuit against MEES almost two years after Sellers sold Major Energy to NGE. The parties dispute, however, whether MEES's allegedly fraudulent marketing in Illinois violated Section 4.7(d), under which Sellers represented that, when the parties executed the MIPA and when the sale closed, "no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Legal Proceeding." MIPA § 4.7(d).

Defendants argue that because the phrase "such Legal Proceeding" in Section 4.7(d) refers only to the type of "Legal Proceeding" in Section 4.7(a), i.e., one that is "pending or, to the Knowledge of Sellers, threatened," they did not breach Section 4.7(d) because the Illinois Attorney General's lawsuit, which was filed in 2018, was neither pending nor threatened when the parties transacted in 2016.

This argument does not withstand even minimal scrutiny.  The word "pending," where used as an adjective, as is the case in Section 4.7(a), means "[r]emaining undecided" or "awaiting decision," both of which require the present existence of the noun that "pending" modifies.  "Pending," Black's Law Dictionary (11th ed. 2019).  Thus, a "pending . . . Legal Proceeding" is one that presently exists.  Section 4.7(d), however, concerns circumstances that "may give rise to, or serve as a basis for," certain "Legal Proceeding[s]."  The "Legal Proceeding[s]" to which Section 4.7(d) refers are therefore future "Legal Proceeding[s]."  Accordingly, if Section 4.7(d) were limited to "pending . . . Legal Proceeding[s]," as defendants maintain, then it would concern circumstances that could give rise to an extant "Legal Proceeding," which is a contradiction in terms.  Defendants' interpretation of Section 4.7(d) consequently violates the cardinal rule that "'[a] contract should not be interpreted to produce a result that is absurd.'"  TiVo Inc. v. Goldwasser, 560 Fed. App'x 15, 19 (2d Cir. 2014) (quoting In re Lipper Holdings, LLC, 766 N.Y.S.2d 561, 561 (N.Y. App. Div., 1st Dep't 2003)).

Rather, recalling that Section 4.7(a) contains a laundry list of existing matters to which Major Energy or its assets are subject, the obvious meaning to ascribe to "Legal Proceedings,"

-14-

which is initial capped throughout Section 4.7, is its definition as provided in Section 1.1, i.e., "any judicial, administrative or arbitral actions, suits, or proceedings (public or private) by or before a Governmental Body," including "any . . . court . . . in any jurisdiction." MIPA § 1.1. Section 4.7(d) is thus reasonably read as representing that, when the parties executed the MIPA and when the sale closed, no events had occurred or circumstances existed that may have given rise to litigation before a court. Thus, to plead a violation of Section 4.7(d), the Indemnified Parties must allege that, when the parties executed the MIPA, such events had occurred or such circumstances existed.

The Indemnified Parties have done just that. They allege that when the parties executed the MIPA, MEES had fraudulently marketed its services to Illinois residents as alleged in the Illinois Attorney General's complaint. That such marketing could have served as the basis for a judicial proceeding against Major Energy is apparent from it having actually served as the basis for such a proceeding, namely, the Illinois Attorney General's lawsuit against MEES. The Indemnified Parties have thus alleged that the representation in Section 4.7(d) was untrue when the parties executed the MIPA, i.e., that Sellers breached that representation.

Sellers protest this conclusion on the ground that Schedule 4.7 -- a copy of which Sellers did not provide to the Court -- disclosed, in their words, "a then-pending action in Illinois based on substantially similar events and circumstances as the Illinois Suit." Defs.' Mem. at 9 n.2. On its face, Sellers' argument is insufficient. Their description of the action that Schedule 4.7 allegedly disclosed is grossly vague. Sellers do not disclose the parties to that action, the court in which it was filed, or the allegations on which it was based. Moreover, if Sellers really were aware of a judicial action based on MEES's allegedly fraudulent marketing in Illinois, then their alleged breaches of Sections 4.7 and 4.8 would appear willful. See infra § II.2(b).

Additionally, Schedule 4.7, as Sellers describe it, disclosed a then-pending action, not the events and circumstances underlying it. Thus, while Schedule 4.7 may preclude the Court from finding that Sellers breached Section 4.7(a) based on that action's pendency, it is hardly apparent that it would prevent the Court from finding that Sellers breached Section 4.7(d) by failing to disclose the events underlying the Illinois Attorney General's lawsuit against MEES. While Sellers maintain that the Illinois Attorney General's lawsuit was based on "substantially similar events" as the action that Schedule 4.7 allegedly disclosed,

Sellers do not contend that the Indemnified Parties were obligated to investigate the factual bases for that action after Sellers had purportedly disclosed it in Schedule 4.7.[1]

The Court accordingly finds that the Indemnified Parties have alleged that Sellers breached Section 4.7(d) based on the events and circumstances that gave rise to the Illinois Attorney General's lawsuit against MEES.

**b. Section 4.8**

Sellers contend that the Indemnified Parties have failed to allege that Sellers violated Section 4.8(a), under which Sellers represented that "[e]ach Company [was] in compliance in all material respects with all Laws applicable to it or its business, properties or assets."  MIPA § 4.8(a).  Sellers do not argue that MEES's allegedly fraudulent marketing would not have been contrary to Illinois law.

---

[1] Sellers repeatedly argue that the Court should construe Section 4.7(d) more narrowly than its plain meaning on the ground that "indemnity language 'must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed.'"  Defs.' Reply at 5 (quoting Hooper Assocs., Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 905 (N.Y. 1989)).  This argument fails for at least two reasons.  First, Section 4.7(d), which is a representation and warranty, contains no indemnity language.  Second, the complete quotation from Hooper is that "[w]hen a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed.  The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances."  548 N.E.2d at 905.  Section 9.2(a), however, imposed a clear legal duty on Sellers to indemnify the Indemnified Parties for "the breach of any representation or warranty of the Sellers contained in Article 4 of this Agreement," and Sellers do not contend otherwise.  MIPA § 9.2(a).

They instead argue that the Indemnified Parties have failed to allege that Sellers knew that MEES was violating Illinois law when the parties executed the MIPA.  But Section 4.8(a) is not limited to what Sellers knew about Major Energy, which is apparent from not only the absence of any such limitation in the language of Section 4.8(a), but also the repeated use of knowledge qualifiers elsewhere in the MIPA.  See, e.g., MIPA §§ 4.7(a) (limiting representation in part "to the Knowledge of Sellers"), 4.4(c) (same), 4.9(c) (same), 4.10(b) (same), 4.11 (same), 4.13(c) (same), 4.14(a)-(b) (same).  Moreover, Sellers' contention that they were unaware of MEES's alleged misconduct is inconsistent with their assertion that Schedule 4.7 disclosed a pending judicial action based on substantially similar events as the Illinois Attorney General's lawsuit against MEES.

Sellers also argue that the Indemnified Parties should not be able to use the allegations from the Illinois Attorney General's complaint to allege that MEES was not in compliance with Illinois law because those allegations were unadjudicated.  Sellers base their argument on Lipsky v. Commonwealth United Corp., in which the Second Circuit struck a complaint's reference to an SEC consent decree because the consent decree was inadmissible under the Federal Rules of Evidence.  551 F.2d 887, 893-94 (2d Cir. 1976).

Although <u>Lipsky</u> stated that its conclusion was limited to "the facts of this case," <u>id.</u> at 893, some courts have construed it as providing that "unproven allegations" from a complaint in another case "do not constitute factual allegations" and are thus immaterial under Rule 12(f), <u>In re CRM Holdings, Ltd. Sec. Litig.</u>, No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *26 (S.D.N.Y. May 10, 2012).

   "Neither Circuit precedent nor logic supports such an absolute rule," however.  <u>In re Bear Stearns Mortg. Pass-Through Certificates Litig.</u>, 851 F.Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012); <u>see, e.g.</u>, <u>In re Mylan N.V. Sec. Litig.</u>, 379 F.Supp. 3d 198, 214 (S.D.N.Y. 2019); <u>Youngers v. Virtus Inv. Partners Inc.</u>, 195 F.Supp. 3d 499, 516 n.10 (S.D.N.Y. 2016).  Indeed, "[i]t makes little sense to say that information from . . . a study [or investigation] -- which the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony -- is immaterial simply because it is conveyed in an unadjudicated complaint." <u>In re Fannie Mae 2008 Sec. Litig.</u>, 891 F.Supp. 2d 458, 471 (S.D.N.Y. 2012) (alterations in original).  To the extent that Sellers cite cases suggesting that Second Circuit precedent requires a contrary result, other cases have cogently explained that those decisions misconstrue that precedent.  <u>See, e.g.</u>, <u>In re Bear Stearns</u>, 851

F.Supp. 2d at 768 n.24; <u>In re OSG Sec. Litig.</u>, 12 F.Supp. 3d 619, 620-21 (S.D.N.Y. 2014).  Accordingly, "[t]here is no absolute rule barring a private plaintiff from relying on government pleadings . . . in order to meet [pleading] thresholds," <u>In re Fannie Mae 2008</u>, 891 F.Supp. 2d at 471, and "the weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings," <u>In re Mylan N.V.</u>, 379 F.Supp. 3d at 214 (collecting cases).

<u>Lipsky</u> therefore does not prohibit the Indemnified Parties from using the unadjudicated allegations in the Illinois Attorney General's complaint -- "a credible complaint based on facts obtained after an investigation" -- to allege that MEES was not in compliance with Illinois law when the parties executed the MIPA. <u>Strougo v. Barclays PLC</u>, 105 F.Supp. 3d 330, 343 (S.D.N.Y. 2015). While Sellers note that the Indemnified Parties denied those allegations in the Consent Decree, Sellers do not assert that that denial binds the Indemnified Parties in this litigation, nor does it appear that they could.  <u>See</u> <u>Ali v. Mukasey</u>, 529 F.3d 478, 489 (2d Cir. 2008) (explaining that a party cannot be estopped from

litigating an issue unless it "was actually litigated and actually decided" in a prior proceeding (quotation marks omitted)).[2]

The Court accordingly finds that the Indemnified Parties have alleged an indemnifiable breach of Section 4.8 by Sellers based on MEES's alleged failure to comply with Illinois law.

### 3. Major Energy's Unpaid Taxes

Sellers do not dispute that Major Energy failed to pay taxes in New York, Massachusetts, and New Jersey as alleged in the complaint. They instead argue that the Indemnified Parties have failed to allege that they breached Sections 4.4, 4.7, and 4.8 based on their failure to pay those taxes.

### a. Section 4.4

Sellers represented in Section 4.4(a) that "[e]xcept as disclosed in Schedule 4.4 . . . [a]ll Taxes due and owing by each Company which are attributable to the Pre-Closing Tax Periods

---

[2] The Court notes, moreover, that "[u]nder New York law, when an indemnitor had notice of the claim against it and an opportunity to take over the defense, the indemnitee need only show potential liability, i.e., that [the] indemnitee could have been found liable at the trial of the underlying action." Koch Indus., Inc. v. Aktiengesellschaft, 727 F.Supp. 2d 199, 222-23 (S.D.N.Y. 2010) (collecting cases). By contrast, "[w]hen the indemnitor had no notice or opportunity to defend, the indemnitee must demonstrate 'actual liability' on the underlying claim." Id. (citing Atl. Richfield Co. v. Interstate Oil Transp., 784 F.2d 106, 113 (2d Cir. 1986)). Accordingly, if, as the Indemnified Parties allege, they informed Sellers of the Illinois Attorney General's lawsuit and offered Sellers the opportunity to take over the defense, then the Indemnified Parties need only demonstrate that MEES was potentially liable to the Illinois Attorney General in order for Sellers to be obligated to reimburse them for the costs incurred in defending that lawsuit, including, of course, their attorneys' fees and the $2 million civil monetary penalty.

. . . shall have been paid as of the Closing Date." MIPA § 4.4(a). Sellers contend that they did not violate Section 4.4(a) on the ground that Schedule 4.4 disclosed Major Energy's unpaid taxes to the Indemnified Parties. Sellers disclosed in Schedule 4.4 that:

> The following Tax Returns are not expected to be filed by Closing and an extension has been requested in each case as of the Closing Date:
>
> > 1. 2015 Form 1065[3] and all related state and local returns for MES, MEES and RP
> >
> > 2. Any 2016 interim Tax Returns for such entities
>
> [MEES] received a notice from the New York City Department of Finance dated February 24, 2016, advising MEES that the NYC Dept. of Finance wishes to examine the book and records of MEES for the tax periods 07/01/13 through 12/31/15, and requesting certain information from MEES as set forth in such notice. This audit is currently ongoing.

Dahan Decl., Ex. 1. The Court addresses whether these disclosures encompassed Major Energy's unpaid taxes in New York, Massachusetts, and New Jersey in turn.

First, consider New York, in which MES had unpaid taxes for the 11 consecutive three-month filing periods the first and last of which ended on May 31, 2014 and November 30, 2016, respectively. Because NGE's purchase of Major Energy from Sellers closed on April 15, 2016, only the first nine of those filing periods are "Pre-

---

[3] 2015 Form 1065 was the document on which U.S. limited liability companies such as MEES, MES, and RP reported their income, losses, deductions, and so forth to the Internal Revenue Service for the 2015 tax year.

Closing Tax Period[s]," which the MIPA defines as "all taxable periods or portions thereof ending on or prior to the Closing Date."  MIPA § 4.4(a).  Thus, the taxes that MEES failed to pay for the last two of those filing periods, which ended on August 31, 2016 and November 30, 2016, respectively, did not violate Section 4.4 because they were not "attributable to . . . Pre-Closing Tax Periods."  MIPA § 4.4(a).  Moreover, because Schedule 4.4 disclosed that MES had not filed its state returns for 2015, the taxes that MES failed to pay for the filing periods that ended on February 28, 2015, May 31, 2015, August 31, 2015, and November 30, 2015 also did not violate Section 4.4.  Nor did the taxes that MES failed to pay for the filing period that ended on February 29, 2016 violate Section 4.4 because Schedule 4.4 disclosed that MES had not filed its 2016 interim state tax returns.  Finally, Schedule 4.4's disclosure regarding the New York City Department of Finance's audit of MEES is unrelated to Major Energy's unpaid taxes in New York, which were taxes that MES, not MEES, had failed to pay.  Thus, with respect to MES's unpaid taxes in New York, the Indemnified Parties have alleged that Sellers violated Section 4.4 based only on the unpaid taxes for the filing periods that ended on May 31, 2014, August 31, 2014, November 30, 2014, and May 31, 2016.

Second, consider Massachusetts, in which MEES had unpaid taxes for the 26 consecutive one-month filing periods the first and last of which ended on July 31, 2014 and August 31, 2016, respectively.  Under the same analysis that the Court just applied to MES's unpaid taxes in New York, Schedule 4.4 disclosed the unpaid taxes in Massachusetts for the filing periods that ended in 2015 and on January 31, 2016, February 29, 2016, March 31, 2016, May 31, 2016, June 30, 2016, July 31, 2016, and August 31, 2016. The Indemnified Parties have thus alleged that Sellers violated Section 4.4 based only on the taxes that MEES failed to pay in Massachusetts for the filing periods that ended on July 31, 2014, August 31, 2014, October 31, 2014, November 30, 2014, December 31, 2014, and April 30, 2016.

Third and finally, Sellers did not violate Section 4.4 based on the taxes that RP failed to pay in New Jersey because those taxes were for filing periods that ended in 2015, and Schedule 4.4 disclosed that RP had not filed any of its state returns for that year.

Accordingly, Schedule 4.4 disclosed most, but not all, of the taxes that Major Energy failed to pay in New York, Massachusetts, and New Jersey, and the Indemnified Parties have alleged that

-24-

Sellers breached Section 4.4 based on the unpaid taxes that Schedule 4.4 failed to disclose.

Sellers retort that even if Schedule 4.4 failed to disclose certain of Major Energy's unpaid taxes, Section 9.2(a) does not require them to indemnify the Indemnified Parties for the resulting taxes, interest, and penalties, which totaled less than $600,000, because Section 9.4(a) provides that Sellers "shall have no liability pursuant to Section 9.2(a) . . . until the Losses incurred by the Buyer Indemnified Parties shall exceed Six Hundred Thousand Dollars ($600,000.00) ('Losses Threshold'), in which event the Sellers shall be liable to the Buyer Indemnified Parties solely for all Losses in excess of such amount." MIPA § 9.4(a).

That argument, however, incorrectly assumes that, for purposes of calculating indemnifiable "Losses," the MIPA unambiguously prohibits the Indemnified Parties from combining the $2,866,270.20 of losses that resulted from MEES's illegal conduct in Illinois, which the Indemnified Parties have alleged resulted from Sellers' breaches of Sections 4.7 and 4.8, with the taxes, interest, and penalties paid in satisfaction of Major Energy's undisclosed unpaid taxes, which the Indemnified Parties have alleged resulted from Sellers' breaches of Section 4.4. The MIPA does not unambiguously prohibit such aggregation. It instead

defines indemnifiable "Losses" to include "<u>all</u> claims, demands, Legal Proceedings, Liens, judgments, penalties, damages losses, costs and expenses (including reasonable attorneys' fees in connection therewith or in pursuing [the] right to indemnification hereunder) . . . that the Buyer Indemnified Parties incur to the extent caused by . . . the breach of <u>any</u> representation or warranty of the Sellers contained in Article 4 of this Agreement," MIPA § 9.2(a) (emphasis added), and is thus reasonably, if not most reasonably, read as defining indemnifiable "Losses" to include each loss that resulted from a violation of a representation and warranty in Article 4.  As the $2,866,270.20 spent in defending and settling the Illinois Attorney General's lawsuit is such a loss, the Indemnified Parties have alleged that their indemnifiable "Losses" exceed $600,000, and Section 9.4(a) obligates Sellers to indemnify the Indemnified Parties for the amount in excess of $600,000.

The Court accordingly finds that the Indemnified Parties have alleged an indemnifiable breach of Section 4.4 by Sellers based on MES's and MEES's failures to pay certain taxes in New York and Massachusetts.

**b. Sections 4.7 and 4.8**

Finally, Sellers contend that the Indemnified Parties have

failed to allege that they breached Sections 4.7 and 4.8 of the MIPA based on Major Energy's unpaid taxes in New York, Massachusetts, and New Jersey.

The Court agrees.  Under Section 4.4, Sellers represented that "[e]ach Company ha[d] filed . . . all Tax Returns required to be filed by it in all jurisdictions in which such returns are required to be filed," and that "[a]ll Taxes due and owing by each Company which [were] attributable to the Pre-Closing Tax Periods . . . ha[d] been paid as of the Closing Date."  MIPA § 4.4(a). Thus, were the Court to conclude that Sellers breached Sections 4.7 and 4.8 based on Major Energy's unpaid taxes in New York, Massachusetts, and New Jersey, it would render the representations in Section 4.4, which specifically concern whether Major Energy had paid all of its taxes, redundant with the general representations in Sections 4.7 and 4.8.  Under New York law, however, it is fundamental that courts "'safeguard against adopting an interpretation that would render any individual provision superfluous,'" Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010) (quoting Bailey v. Fish & Neave, 868 N.E.2d 956, 959 (N.Y. 2007)), and that "definitive, particularized contract language take[] precedence over expressions of intent that are general, summary, or

preliminary," <u>John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.</u>, 717 F.2d 664, 670 n.8 (2d Cir. 1983) (collecting cases). The Court accordingly finds that the representations in Sections 4.7 and 4.8 did not encompass whether Major Energy had paid all of its taxes for pre-closing tax periods, and that the Indemnified Parties have therefore failed to allege that Sellers breached Sections 4.7 and 4.8 based on Major Energy's unpaid taxes.

### III. CONCLUSION

Sellers' motion to dismiss is granted in part and denied in part for the reasons stated herein.   The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 18.

**SO ORDERED.**

Dated:     New York, New York
           July 31, 2020

_____
     NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE